IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| DUNCAN SERVICES, INC., et al. | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 8:09-cv-02486-AW |
| EXXONMOBIL OIL CORPORATION, et al. | : | **REQUEST FOR HEARING** |
| Defendants. | : | |

## PLAINTIFFS' MOTION FOR RECONSIDERATION

Pursuant to Fed. R. Civ. P. 54(b) and Local Rule 105.10, the Non-White Oak Transaction Plaintiffs, through undersigned counsel, move for reconsideration of this Court's Order (filed November 6, 2009) dismissing the claims of the Non-White Oak Transaction Plaintiffs and denying their request for a temporary restraining order and preliminary injunction. As explained in the Memorandum below, which is incorporated by reference, defendant ExxonMobil has now contracted with a non-refiner purchaser to sell the remaining Maryland station assets (including plaintiffs' stations), and has given the plaintiff dealers notice of that sale and intention to assign. Reconsideration is required because evidence that was not previously available is now presented, and reconsideration is necessary to prevent a manifest injustice.

WHEREFORE, it is respectfully requested that the Court reconsider its prior decision, deny the motion to dismiss, and grant the motion of the Non-White Oak Transaction Plaintiffs for injunctive relief pending a trial on the merits.

# MEMORANDUM IN SUPPORT OF
# <u>MOTION FOR RECONSIDERATION</u>

I. <u>Introduction and Background.</u>

By Memorandum Opinion and Order filed on November 6, 2009, this Court denied the Non-White Oak Transaction Plaintiffs' request for injunctive relief, and dismissed their claims. Without reaching the merits, the Court found in essence that the action was premature, and that plaintiffs' claims were too speculative absent "receipt of actual notice of an impending transfer, including, amongst other information, the identity of the assignee and the terms of the sale..." Mem. Op. at 13. At the time plaintiffs filed this action and Court ruled on the motions, this information was not available as ExxonMobil had not yet contracted with or identified the buyer. <u>That is no longer the case.</u>

On Monday, November 16th, ExxonMobil gave written notice to its Maryland dealers of a teleconference set for 2:30 p.m. EST to provide an update on the U.S. Retail Business. *See* Declaration of Wendell J. Duncan (hereinafter "Duncan Decl.") attached hereto as **Exhibit A**. The notice contained the access code and dialing instructions for the teleconference. Dealers who called in were advised that ExxonMobil had contracted for the sale of the remainder of its stations in the Maryland and Delaware markets to Southside Oil Company, a Virginia jobber/distributor (non-refiner). Dealers who participated in the call were further advised that ExxonMobil and Southside would be hosting a set of meetings over the following two days, and dealers thereafter received an invitation to such meetings. *Id.* Shortly thereafter, various trade publications and newspapers confirmed the transaction. *Id.*

ExxonMobil and Southside held a series of meetings on November 17th and 18th. In attendance at the meeting on November 18th from ExxonMobil were Heidi J. Disch, U.S. Dealer Business Manager, and John Bednash, Area Sales Manager. ExxonMobil confirmed that a

2

contract had been signed with Southside, and Dealers were introduced to Steve Uphoff, the owner (along with his wife) of Southside Oil. ExxonMobil represented that Southside was selected as the purchaser of the remaining Maryland assets, and that Southside and Exxon would be closing soon.

Mr. Uphoff spoke about Southside, and its intended acquisition. He indicated that he and his wife own Southside, that it markets in Virginia as a distributor for ExxonMobil and BP, and further indicated that the intended ExxonMobil acquisition will more than double the size of his company. He advised that he intends to finance the acquisition through a consortium of 10 banks and a private equity partner, and that it is his intention to acquire the station properties in separate limited liability companies because it will make it easier to sell. While the purchase price has not been disclosed, it is estimated that the price for the 172 stations involved exceeds $220 million. *Id.*

Mr. Uphoff indicated that Southside operates various of its existing stations in Virginia through company employees, and that in Maryland following the acquisition he wants to have a combination of commissioned agents, company stores and dealers. As discussed below, under the plaintiffs' relationship with ExxonMobil, both company-operated stations and commissioned agents are prohibited by law. *Id.*

Southside Oil does not presently market in the State of Maryland. Indeed, the Maryland Department of Assessments and Taxation has no record of the company. It does not appear that Southside Oil has ever done business here, and it has no office, staff or other presence here. And, most significantly, it is not a refiner.

As discussed below, the developments of the last several days now provide the predicate for action that the Court previously found lacking. ExxonMobil's intended action is now certain

3

and concrete. Not only has the buyer/assignee been identified, a contract signed, and the sale announced. The buyer has indicated its intention to engage in the very action about which the plaintiffs' concerns have been directed — company operated stations and commissioned agent arrangements. Not only will dealers be forced to compete against their exclusive supplier and landlord—something about which they presently have no concern—their relationship with Southside will be very different from that which they enjoy now. Unlike ExxonMobil, Southside will not need the dealers in the relationship. Moreover, unlike ExxonMobil, Southside can and will operate in a manner contrary to that presently prohibited under Maryland's retail divorcement statute, MD. BUS. REG CODE ANN. ("BR") § 10-311(a). There will no longer be an incentive of necessity to keep the dealers, and this fact alone increases the dealers' risks and burdens and presents a compelling case for the Court to act.

II.     Discussion.

In *Weyerhaeuser Corp. v. Koppers Co., Inc.,* 771 F. Supp. 1406, 1419 (D. Md. 1991), this Court recognized that "[a] motion for reconsideration (or, to alter or amend judgment) made pursuant to Fed. R. Civ. P. 59(e) may be made for one of three reasons: (1) an intervening change in the controlling law has occurred, (2) evidence not previously available has become available, or (3) it is necessary to correct a clear error of law or prevent manifest injustice." Reconsideration is warranted in this case under both the second and third prongs.

At the time of the initial briefing and hearing, no buyer had been announced, and no contract signed between ExxonMobil and its intended buyer/assignee. For this reason, the Court found that:

> [g]iven the fact-specific nature of the inquiry into constructive termination, it is impossible for the Court to enter that inquiry absent at least the minimal information of to whom the contracts will be assigned and a definitive statement of intent to assign the

4

> franchises. When there is no indication of the identity of the assignee, it is difficult for the Court to determine whether the assignment is invalid under state law, or whether it results in a breach of one of the three statutory components of a franchise. Without a showing of notice of assignment or actual assignment, the Court cannot determine if the assignment constitutes a constructive termination.

Mem. Op at 10-11. That is no longer the case.

The identity of the assignee is now determined, and notice has been given of the intended sale and assignment. *See* Duncan Decl. at ¶¶ 4 and 5. That identified assignee is a <u>non-refiner</u> with no Maryland presence or experience who operates stations with company employees and who has indicated an intention to operate with commissioned agents. In light of Maryland's retail divorcement statute and the nature of the plaintiffs' relationship with ExxonMobil the refiner, an assignment to Southside Oil will necessarily and absolutely increase the dealers' risks and burdens under the relationship and make it less likely of receiving return performance. *See* MD. COMM. CODE ANN. § 2-210(2).

As previously argued in the Plaintiffs' Opposition to ExxonMobil's Motion to Dismiss (Docket Entry 36), Plaintiffs' Memorandum in Support of Preliminary Injunction (Docket Entry 4), and Plaintiffs' Reply Memorandum (Docket Entry 37), which are incorporated by reference, Maryland's retail divorcement statute uniquely impacts the risks/burdens analysis. Under their contract and relationship with ExxonMobil, plaintiffs' exclusive supplier/landlord is subject to the statutory proscription that precludes it from operating stations either directly or indirectly "(i) with a commissioned agent, company personnel, or a subsidiary company; or (ii) under a contract with a person who manages the station on a fee arrangement with the producer or refiner." BR § 10-311(a). Dealers presently have no concern about retail competition from their supplier/landlord, and they are safe in the knowledge that they are an essential part of the

5

fuel distribution relationship. Immediately after the assignment to Southside, this will change. Southside can, and has already indicated that it will, operate stations at retail and through commissioned agents. *See Korangy v. Mobil Oil Corp.*, 84 F. Supp.2d 660, 665 (D. Md. 2000)(recognizing that assignment could amount to a constructive termination/nonrenewal, and denying summary judgment in part based on finding that a reasonable jury could find that Korangy had legitimate concerns about being "squeezed out of his franchise by a franchisor [not subject to Maryland's divorcement statute] seeking to take over the station's operations.").

The loss of the protection and status afforded the plaintiffs under Maryland's retail divorcement statute singularly distinguishes this case. Maryland's unique divorcement legislation defines the contractual relationship between plaintiffs and ExxonMobil under the Franchise Agreements. Plaintiffs' rights, risks, burdens and chance of receiving return performance under the Franchise Agreements are necessarily determined by the legislative status into which the divorcement status placed the parties. The loss of plaintiffs' protected status through ExxonMobil's assignment to a non-refiner must be viewed as an event that materially impacts and adversely affects plaintiffs' risks, burdens and chances of receiving return performance. Indeed, it will be impossible for plaintiffs to receive the same performance from a non-refiner.

With the possible exception of *Korangy*, there is no other assignment case like this one, and the issue is now ripe, and the consequences certain. As the Fourth Circuit said in *Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 363 (4th Cir. 1986)("*Barnes I*"),"[a]n assignment that is invalid under state law because it increases the franchisee's burdens is tantamount to a constructive termination of the franchise." The loss of divorcement protection by itself does just that, and a constructive termination is now imminent. Under the relaxed preliminary injunction standard

articulated in *Barnes II*, 824 F.2d 300, 306 (4th Cir. 1987), "designed to benefit the small retailer" and "intentionally drawn to facilitate the grant of injunctive relief," such injunctive relief is now mandated.

III.   Conclusion.

For the reasons contained herein, and for the additional reasons discussed in the prior memoranda incorporated by reference, the Court should reconsider its Memorandum Opinion and Order and direct the entry of a preliminary injunction, enjoining defendant ExxonMobil from conveying the non-White Oak dealers' station properties, and assigning their franchises while this action is pending.

**REQUEST FOR HEARING**

A hearing is requested on this motion.

Respectfully submitted,

LERCH, EARLY & BREWER, CHARTERED

_____/s/_____
Harry C. Storm  No. 0816
Stuart A. Schwager, No. 22924
3 Bethesda Metro Center, Suite 460
Bethesda, MD  20814
(301) 907-2817
hcstorm@lerchearly.com
saschwager@lerchearly.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY that a copy of Plaintiffs' Motion for Reconsideration was served this 20th day of November, 2009 using the CM/ECF system, which system will serve by electronic service the following participant-parties in the CM/ECF System:

Alphonse M. Alfano, Esq.
Bassman, Mitchell & Alfano, Chartered
1707 L Street, N.W. – Suite 560
Washington, D.C. 20036

Maurice A. Bellan, Esq.
Arent Fox, LLP
1050 Connecticut Avenue, NW
Washington, DC 20036

Howard N. Berliner, Esq.
Berliner Law Firm
815 Connecticut Avenue NW, Suite 220
Washington, D.C. 20006

The following non-CM/ECF participant-parties will be served by electronic mail:

Mark S. Lillie, P.C.
Andrew A. Kassof, P.C.
A. Katrine Jakola, Esq.
Joseph M. Russell, Esq.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Email: mark.lillie@kirkland.com
   andrew.kassof@kirkland.com
   katie.jakola@kirkland.com

Jeffrey L. Leiter, Esq.
Leiter & Cramer, PLLC
815 Connecticut Avenue, NW, Suite 220
Washington, DC 20006
Email: jll@leitercramer.com

               /s/
               Harry C. Storm

941897.3                               82139.001